Receipt number AUSFCC-5753246

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

LAX ELECTRONICS, INC.
d/b/a AUTOMATIC CONNECTOR,

Plaintiff,

v.

DEFENSE LOGISTICS AGENCY
LAND AND MARITIME,

Defendant.

Case No.: 19-1668 C

**COMPLAINT FOR DECLARATORY RELIEF AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

**INTRODUCTION**

1. This is an action seeking review of an improper removal of Lax Electronics, Inc. d/b/a Automatic Connector ("Automatic") from the Qualified Parts List ("QPL") for parts MIL-PRF- 39012 and MIL-PRF-55339 ("connectors") by the United States Department of Defense Logistics Agency Land and Maritime ("DLA") based upon Automatic's alleged failure to meet its obligations under the QPL program. Not only has DLA violated 48 CFR 9.207 and DoDM 4120.24 procedures for removal, it has also violated FAR 9.205. DLA issued an Audit Report dated June 26-27, 2019, stating that certain problems were found, and requested that Automatic provide certain Corrective Action Reports ("CAR"). Automatic spent a significant amount of time and effort on creating and implementing the CARs, with no analysis and review from DLA. Instead, two months later, DLA removed Automatic from the QPL and stated that Automatic "is afforded an opportunity to respond and set forth any facts you deem relevant to this matter." Despite pleas from Automatic, notifying Automatic that it has provided its CARs, DLA would not and will not communicate with Automatic to provide a meaningful and bonafide opportunity to allow Automatic to participate in the procurement process. Almost on a continuous basis,

DLA is and has been requesting quotes for connectors, and DLA has provided no meaningful opportunity for Automatic to participate in the process through a direct contract or a subcontract with other vendors.

## JURISDICTION

2. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. section 1491(b) because the instant action is one by an interested party objecting to violations of federal Administrative Procedure Act ("APA") and federal Competition in Contracting Act ("CICA") in connection with proposed procurements.

## PARTIES

3. Plaintiff Lax Electronics, Inc. d/b/a Automatic Connector ("Plaintiff" or "Automatic") is a New York State corporation, with its principal place of business at 375 Oser Avenue, Hauppauge, NY 11788.

4. Defendant United States Department of Defense Logistics Agency Land and Maritime ("Defendant" or "DLA") is an agency of the United States Department of Defense that manages the global supply chain – from raw materials to end user to disposition – for the Army, Navy, Air Force, Marine Corps, Coast Guard, 10 combatant commands, and other federal agencies.

## DLA CONNECTOR ACQUISITION

5. To conduct its procurements of parts, DLA uses a QPL which lists products or families of products that have met the qualification requirements set forth in the applicable specification, including appropriate product identification, tests or qualification references, and the name and plant address of the manufacturer and authorized distributor. A QPL listing is used by government activities to determine approved sources of supply for items they wish to procure.

The DLA will then issue requests for quotes and bids, and then will issue contracts for parts and products to companies who have parts on the QPL.

6. For over 50 years, Automatic has had parts listed on the QPL, and over the years has successfully supplied contractors and the Government with products in response to solicitations for bids requiring that products be supplied only by manufacturers on the QPL.

7. Several years ago, DLA sent an auditor by the name of Sonya Taylor into Automatic's facility, and she conducted an audit, wrote up her concerns, and tried to stop Automatic from shipping and producing connectors. Based upon appeals to the upper management of DLA, Ms. Taylor's attempts to stop Automatic from producing and supplying parts were overridden by DLA's upper management. Ms. Taylor openly vowed then that "next time," she would put a stop to Automatic.

8. In the interim, DLA issued MIL-STD-790 ("790"), which imposed heavy paperwork burdens on a contractor. Automatic has no record of being contacted regarding the implementation of 790. As a matter of fact, as recently as May 1, 2019, the DLA issued a supplemental information for parts 39012 and stated that 790 did not apply to this particular connector item (See Exhibit 1).

9. In or about, June 26-27, 2019, Ms. Taylor again appeared and performed an audit of Automatic's facility. She indicated then that she was not going to let upper management interfere with her decision-making process and then issue an Audit Report primarily based upon 790. Her report specifically states that:

> Corrective actions for the findings identified above are required within 30 days, unless extended by DLA Land and Maritime-VQP. Compliance is required in order to maintain your qualification listings. DLA Land and Maritime-VQP will evaluate the corrective actions and provide written confirmation of approval. When responding, please maintain the numbering given for the finding(s) and highlight any changes to documents. Manufacturers may use their internal

> corrective action/quality forms when responding to the findings in this report. DLA Land and Maritime prefers communication of audit findings and any supporting objective evidence by email.

10. DLA sent Automatic a letter on July 2, 2019, which put Automatic on Stop Shipment/Stop Production status for the connectors due to the alleged violations discovered as a result of the Audit Report.

11. Automatic spent a substantial time and effort pursuant to Ms. Taylor's request and carefully drafted Corrective Action Reports for the findings and forwarded those to her on August 6, 2019 (See Exhibit 2).

12. Not hearing anything back from her, Automatic attempted to communicate with her and DLA Sourcing and Qualifications Chief Robert M. Heber, and tried to set up a meeting to further discuss those reports, with no response from Mr. Heber or Ms. Taylor.

13. Instead on sitting down with Automatic, Ms. Taylor sent Automatic a letter on August 13, 2019, stating in part that Automatic has to issue a GIDEP (Government-Industry Data Exchange Program) for parts M39012 and M55339, as was purportedly discussed in the Audit. Even though she references the Audit, she did not acknowledge the CARs that Automatic submitted, or allege that the CARs were somehow deficient. In her letter, she only focused on stating that a GIDEP would need to be issued that included the issues detailed in the June 2019 Audit Report.

14. Automatic responded on August 15, 2019 with a letter that stated in part that Automatic thinks that Ms. Taylor's request is premature, because the Audit Report did not state that Automatic must issue a GIDEP, but actually stated that "DLA may require companies to use the GIDEP system for industry notifications if the need arises." The letter further states that there are no current reports of defects or problems with any of the products that are supplied by

Automatic. The letter also requested DLA to provide any regulations they have which requires Automatic issue a GIDEP without taking into account Automatic's CARs.

15. Automatic has constantly reiterated that it has not received a response to the CARs, and that it would like to discuss the reports as soon as possible with DLA.

16. GIDEP is a cooperative activity between government and industry participants seeking to reduce or eliminate expenditures of resources by making maximum use of existing information. The program provides a media to exchange technical information essential during research, design, development, production and operational phases of the life cycle of systems, facilities and equipment. GIDEP also uses reports to provide a means to exchange information about non-conforming items in government and industry systems. These reports (Alerts, Safe Alerts, Problem Advisories, Agency Action Notices and Lessons Learned) inform the GIDEP participants that a problematic situation exists and prevent usage of problematic products.

17. On September 12, 2019, DLA issue a letter removing Automatic from the QPL, claiming that the Audit Report revealed a repeated and continuing course of conduct resulting in program violations and Automatic's alleged refusal to issue a GIDEP report informing the world about Automatic's alleged program violations. (Exhibit 3).

18. Automatic is now being precluded from supplying connectors to its contractors and/or the Government, because Automatic will not be able to requalify since it does not know how the CARs were deficient.

19. The Government now demands that Automatic, a small business, requalify all of its parts again, which would entail requalifying 610 parts and costing Automatic approximately $15,000 per part to requalify, and costing Automatic approximately $9,150,000.00 to requalify all of the parts. Furthermore, the requalification process would be a sham, because Ms. Taylor is

sitting on the CARs and has not provided Automatic any feedback or response explaining how the CARs are allegedly deficient.

20. On October 9, 2019, DLA sent Automatic a letter, stating that it intends to issue a GIDEP alert on or shortly after October 31, 2019, alleging non-compliances and violations to MIL-PRF-39012 and MIL-PRF-55339, stating that it will be forwarded to the GIDEP office for distribution to thousands of government and industry GIDEP participants. (Exhibit 4).

21. Automatic has contacted DLA's counsel requesting that DLA provide feedback on how the CARs are allegedly deficient and to hold off on issuing a GIDEP Alert until a decision is made by the Court. DLA has refused, and advised Automatic that DLA does not have to provide feedback, since Automatic has been removed from the QPL.

**CLAIM I**

**(Injunctive Relief, 5 U.S.C. § 706)**

22. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 20, above.

23. Plaintiff seeks a preliminary injunction and permanent injunctive relief preventing DLA from removing Automatic's parts from the QPL and from DLA issuing solicitations for the part numbers referenced above.

24. Plaintiff Automatic has no adequate remedy at law to prevent the destruction of its business from the Defendant DLA's arbitrary and capricious actions.

25. Under 5 U.S.C. section 706, the Court has the authority to "compel agency action unlawfully withheld or unreasonably delayed." Section 706 grants also grants the Court the authority to "hold unlawful and set aside agency action, findings, and conclusions" which are 1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 2) "in

excess of statutory jurisdiction, authority, or limitations," or 3) "without observance of procedure required by law."

26. Before DLA could remove Automatic's parts from the QPL, DoDM 4120.24, Enclosure 14, Section 11(e) states in part that:

> . . .
> (2) The qualifying activity conducts a preliminary evaluation and risk assessment of the problem, and imposes a stop shipment on all suspect products, if necessary, to limit the magnitude of the problem while determination and corrective actions are made.
> . . .
> (4) The qualifying activity initiates a product stop shipment order or corrective action plan (as applicable) and initiates removal of parts or manufactures from the electronic QPL or the QML in accordance with section 12 of this enclosure.
> (5) The qualifying activity instructs manufacturers to prepare and coordinate issuance of a GIDEP alert or problem advisory. The qualifying activity should prepare and issue the GIDEP alert or problem advisory when the manufacturer is reluctant or slow in doing so. The qualifying activity should use GIDEP Failure Experience Data Reports available at http://www.gidep.org/data/failure/failure.htm to notify part users of the problem.

27. DoDM 4120.24, Enclosure 14, Section 12 states in part that:

> a. Reasons for Removal. When a supplier fails to comply or demonstrates an inability to comply with specification requirements, the qualifying activity must remove the product(s) from the electronic QPL or remove the applicable process(es) from the electronic QML. Removal could include a broad range of directly or indirectly affected products, possibly the manufacturer's entire family of qualified products. The qualifying activity must also remove the manufacturer's certification, and may direct the manufacturer to stop shipment, when such action is necessary to ensure that the manufacturer provides compliant products. The qualifying activity should not remove a product, a manufacturer, or a process from an electronic QML or QPL solely on the basis that the qualifying activity did not perform a facility (plant) audit within the planned audit cycle. Adverse actions or removal might be warranted under these circumstances:
> . . .
> (6) Failure of a manufacturer to notify the qualifying activity of a change in design, material, manufacturing, process (including quality conformance), or plant location.
> . . .
> (8) The manufacturer has not complied with the retention of qualification requirements.

. . .
(11) Failure to comply with an audit or denial of access of authorized personnel to perform such an audit.

b. Procedures for Removal. These procedures apply to removal of a product, a family of products, process, or supplier from an electronic QPL or QML:
(1) If the decision to remove a product or process from an electronic QPL or QML is made for the reasons indicated in paragraphs 12.a.(1), 12.a.(4), 12.a.(6), 12.a.(8) or 12.a.(9) of this enclosure, consideration must be given to the circumstances that gave rise to that action. The product or process should again be included on the electronic QPL or QML once the deficiencies noted have been corrected to the government's satisfaction. Factors to be considered in making that determination are the seriousness of the deficiencies noted, the circumstances under which those deficiencies came to light (for example, government audit or voluntary disclosure), and whether circumstances indicate that such actions were intentional or fraudulently motivated or reflect a repeated or continuing course of conduct.
(2) When it is decided that a product, family of products, or process is to be removed from an electronic QPL or QML, the supplier of the products or process must be sent a written notice (registered, with a return receipt requested) of the action taken, the reasons for removal, and an opportunity to respond to that notice. Unless the notice indicates otherwise, removal of a product, family of products, or process from the electronic QPL or QML is effective on the date of the notice.

c. Notification of Removal. After the qualifying activity determines that a product, family of products, a process, or a supplier will be removed from an electronic QPL or QML, the qualifying activity must send the supplier a notification of removal. The qualifying activity must update the electronic QPL or QML to delete the items without undue delay. If removal is for the reason indicated in paragraph 12.a.(5) of this enclosure, the qualifying activity must advise the supplier of the action required to prove product compliance to the amended or revised specification. The qualifying activity must provide copies of the notification of removal to interested DoD elements and other government agencies.

d. Publication of Removal. When the qualifying activity has taken action to remove a product from an electronic QPL or QML, the qualifying activity must determine whether it would be in the government's interest to publish in GIDEP, FedBizOpps, and related trade publications, a notification to government organizations and contractors that the product has been removed by adverse action…

28. As stated above, DLA put Automatic on a stop shipment/stop production status because of the alleged violations that are listed in the Audit Report. In accordance with DLA's

directions included in the Audit Report, Automatic timely created CARs and is implementing the corrective actions pursuant to the CARs that Automatic provided to DLA. However, again, Automatic has not received any response to the CARs.

29. Pursuant to DoDM 4120.24, Enclosure 14, Section 11(e)(2), the stop shipment should have only lasted while corrective actions were made. However, DLA apparently determined that the Automatic CARs were deficient, and subsequently removed Automatic from the QPL, without giving Automatic a chance to correct any alleged deficiencies that may exist with the CARs.

30. Since DLA chose to remove Automatic from the QPL, DLA is then supposed to follow the procedures of DoDM 4120.24, Enclosure 14, Section 12(b)(1), which states in part that "The product or process should again be included on the electronic QPL or QML once the deficiencies noted have been corrected to the government's satisfaction." However, Automatic could not correct the alleged deficiencies listed in the Audit Report to the Government's satisfaction, because, as stated repeatedly herein, DLA never provided any feedback to Automatic's CARs.

31. Had DLA provided feedback, Automatic could have corrected the alleged violations listed in the Audit Report and would have been put back on the QPL and would not be in a situation where Automatic is being forced to spend millions of dollars in order to requalify its parts.

32. DLA now wants to issue a GIDEP Alert, and DLA makes it seem that it does not have a choice in the matter, when DLA actually does have a choice. DoDM 4120.24, Enclosure 14, Section 12(d) states in part that "… qualifying activity has taken action to remove a product from an electronic QPL or QML, the qualifying activity must determine whether it would be in

the government's interest to publish in GIDEP…" Automatic's parts that DLA removed from the QPL were removed for alleged violations that dealt with the traceability of the parts (i.e. a paperwork issue), and not with the parts failing to perform as required.

33. By DLA issuing the GIDEP Alert, it could cause significant harm to Automatic's business.

34. Defendant DLA should be enjoined from excluding Automatic's parts from the QPL unless the Defendant fully and fairly complies with the requirements of DoDM 4120.24, Enclosure 14, Sections 11 and 12.

**CLAIM II**

**(Declaratory Relief, 28 U.S.C. § 2201)**

35. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 33, above.

36. DLA has prevented Automatic from being included back on the QPL, has prevented Automatic from qualifying for additional DLA contracts, and has discouraged full and open competition for DLA contracts.

37. Where possible, procuring agencies must give bidders sufficient time to qualify products prior to award of a contract subject to qualification requirements (FAR § 9.205(a)).

38. Also, when initiating a qualification requirement, the agency must furnish notice of the intent to establish a qualification requirement, including, among other things, the "anticipated date that the agency will begin awarding contracts subject to the qualification requirement." (FAR § 9.205(a)).

39. Furthermore, FAR § 9.205(b) states that "The activity responsible for establishing a qualification requirement must keep any list maintained of those already qualified open for inclusion of additional products, manufacturers, or other potential sources."

40. In addition, FAR § 9.206-3(a), encourages competition states in part that

> If a qualification requirement applies to an acquisition, the contracting officer shall review the applicable QPL, QML, ... which have met the requirement before issuing a solicitation to ascertain whether the number of sources is adequate for competition. ... If the number of sources is inadequate, the contracting officer shall request the agency activity which established the requirement to –
> (1) Indicate the anticipated date on which any sources presently undergoing evaluation will have demonstrated their abilities to meet the qualification requirement so that the solicitation could be rescheduled to allow as many additional sources as possible to qualify; or
> (2) Indicate whether a means other than the qualification requirement is feasible for testing or demonstrating quality assurance.

41. DLA issues Solicitations for manufacturers to bid and provide parts to the Government. The Solicitation requires that the parts be on the QPL.

42. As stated above, DLA completed an Audit of Automatic's facility, and allegedly found deficiencies at Automatic's facility. Pursuant to the Audit Report, Automatic could provide CARs to correct the deficiencies and DLA would provide a certified response.

43. DLA has not provided any formal response, and have subsequently removed Automatic from the QPL.

44. Furthermore, as a result of DLA not providing a response to the CARs, which would identify any alleged deficiencies in the CARs, DLA has prevented Automatic from being included back on the QPL.

45. DLA has also prevented Automatic from being able to requalify for the QPL, because Automatic does not know what CARs are allegedly deficient, and as such, will not be able to requalify for the QPL and will not be able to bid on DLA Solicitations.

46. As such, DLA has discouraged and denied Automatic from competing for DLA contracts.

**PRAYER FOR RELIEF**

Therefore, Plaintiff prays that this Court:

1. Preliminary and permanently enjoin DLA from issuing the GIDEP Alert.

2. Preliminary and permanently enjoin DLA from issuing any more contracts for parts that Automatic had listed on the QPL.

3. Declare that DLA cannot, consistent with the statutory requirement for full and open competition, established a qualification requirement, exclude Automatic from the QPL by failing to provide a formal response to the CARs, stating how they are allegedly deficient.

4. For such other relief as the Court may deep appropriate.

Dated: October 28, 2019
Auburn, New York

*<u>/s/ Justin T. Huffman</u>*
Justin T. Huffman, Esq.
Camardo Law Firm, P.C.
*Attorneys for Plaintiff*
127 Genesee Street
Auburn, New York 13021
Tel: (315) 252-3846
Fax: (315) 252-3508
Email: justinhuffman@camardo.com