## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LAX ELECTRONICS, INC.
d/b/a AUTOMATIC CONNECTOR,

<table>
<tr><td>Plaintiff,</td><td>Case No.: 19-1668C</td></tr>
<tr><td>v.</td><td>**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**</td></tr>
<tr><td>DEFENSE LOGISTICS AGENCY LAND AND MARITIME</td><td></td></tr>
<tr><td>Defendant.</td><td></td></tr>
</table>

## INTRODUCTION

1.       This is an action seeking review of an improper removal of Lax Electronics, Inc. d/b/a Automatic Connector ("Automatic") from the Qualified Parts List ("QPL") for parts MIL-PRF- 39012 and MIL-PRF-55339 ("connectors") by the United States Department of Defense Logistics Agency Land and Maritime ("DLA") based upon Automatic's alleged failure to meet its obligations under the QPL program.  Not only has DLA violated 48 CFR 9.207 and DoDM 4120.24 procedures for removal, it has also violated FAR 9.205.  DLA issued an Audit Report dated June 26-27, 2019, stating that certain problems were found, and requested that Automatic provide certain Corrective Action Reports ("CAR").  Automatic spent a significant amount of time and effort on creating and implementing the CARs, with no analysis and review from DLA. Instead, two months later, DLA removed Automatic from the QPL and stated that Automatic "is afforded an opportunity to respond and set forth any facts you deem relevant to this matter." Despite pleas from Automatic, notifying Automatic that it has provided its CARs, DLA would not and will not communicate with Automatic to provide a meaningful and bonafide opportunity to allow Automatic to participate in the procurement process.  Almost on a continuous basis,

DLA is and has been requesting quotes for connectors, and DLA has provided no meaningful opportunity for Automatic to participate in the process through a direct contract or a subcontract with other vendors.

2. As a result of the DLA's refusal to provide Automatic with information as to what purported deficiencies persisted after Automatic provided DLA with its CARs, DLA is not only barring Automatic from bidding on the continuing stream of solicitations for the connectors, but also, DLA is refusing to provide Automatic with any sort of reasonable opportunity to arrange for qualification before award of various contracts for the connectors.

## JURISDICTION

3. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. section 1491(b) because the instant action is one by an interested party objecting to violations of federal Administrative Procedure Act ("APA") and federal Competition in Contracting Act ("CICA") in connection with proposed procurements.

## PARTIES

4. Plaintiff Lax Electronics, Inc. d/b/a Automatic Connector ("Plaintiff" or "Automatic") is a New York State corporation, with its principal place of business at 375 Oser Avenue, Hauppauge, NY 11788.

5. Defendant United States Department of Defense Logistics Agency Land and Maritime ("Defendant" or "DLA") is an agency of the United States Department of Defense that manages the global supply chain – from raw materials to end user to disposition – for the Army, Navy, Air Force, Marine Corps, Coast Guard, 10 combatant commands, and other federal agencies.

## DLA CONNECTOR ACQUISITION

6.     To conduct its procurements of parts, DLA uses a QPL which lists products or families of products that have met the qualification requirements set forth in the applicable specification, including appropriate product identification, tests or qualification references, and the name and plant address of the manufacturer and authorized distributor. A QPL listing is used by government activities to determine approved sources of supply for items they wish to procure. The DLA will then issue requests for quotes and bids, and then will issue contracts for parts and products to companies who have parts on the QPL.

7.     For over 50 years, Automatic has had parts listed on the QPL, and over the years has successfully supplied contractors and the Government with products in response to solicitations for bids requiring that products be supplied only by manufacturers on the QPL.

8.     Several years ago, DLA sent an auditor by the name of Sonya Taylor into Automatic's facility, and she conducted an audit, wrote up her concerns, and tried to stop Automatic from shipping and producing connectors. Based upon appeals to the upper management of DLA, Ms. Taylor's attempts to stop Automatic from producing and supplying parts were overridden by DLA's upper management. Ms. Taylor openly vowed then that "next time," she would put a stop to Automatic.

9.     In the interim, DLA issued MIL-STD-790 ("790"), which imposed heavy paperwork burdens on a contractor. Automatic has no record of being contacted regarding the implementation of 790. As a matter of fact, as recently as May 1, 2019, the DLA issued a supplemental information for parts 39012 and stated that 790 did not apply to this particular connector item (See Exhibit 1).

10. In or about, June 26-27, 2019, Ms. Taylor again appeared and performed an audit of Automatic's facility. She indicated then that she was not going to let upper management interfere with her decision-making process and then issue an Audit Report primarily based upon 790. Her report specifically states that:

> Corrective actions for the findings identified above are required within 30 days, unless extended by DLA Land and Maritime-VQP. Compliance is required in order to maintain your qualification listings. DLA Land and Maritime-VQP will evaluate the corrective actions and provide written confirmation of approval. When responding, please maintain the numbering given for the finding(s) and highlight any changes to documents. Manufacturers may use their internal corrective action/quality forms when responding to the findings in this report. DLA Land and Maritime prefers communication of audit findings and any supporting objective evidence by email.

11. DLA sent Automatic a letter on July 2, 2019, which put Automatic on Stop Shipment/Stop Production status for the connectors due to the alleged violations discovered as a result of the Audit Report.

12. Automatic spent a substantial time and effort pursuant to Ms. Taylor's request and carefully drafted Corrective Action Reports for the findings and forwarded those to her on August 6, 2019 (See Exhibit 2).

13. Not hearing anything back from her, Automatic attempted to communicate with her and DLA Sourcing and Qualifications Chief Robert M. Heber, and tried to set up a meeting to further discuss those reports, with no response from Mr. Heber or Ms. Taylor.

14. Instead on sitting down with Automatic, Ms. Taylor sent Automatic a letter on August 13, 2019, stating in part that Automatic has to issue a GIDEP (Government-Industry Data Exchange Program) for parts M39012 and M55339, as was purportedly discussed in the Audit. Even though she references the Audit, she did not acknowledge the CARs that Automatic submitted, or allege that the CARs were somehow deficient. In her letter, she only focused on

stating that a GIDEP would need to be issued that included the issues detailed in the June 2019 Audit Report.

15.     Automatic responded on August 15, 2019 with a letter that stated in part that Automatic thinks that Ms. Taylor's request is premature, because the Audit Report did not state that Automatic must issue a GIDEP, but actually stated that "DLA may require companies to use the GIDEP system for industry notifications if the need arises." The letter further states that there are no current reports of defects or problems with any of the products that are supplied by Automatic. The letter also requested DLA to provide any regulations they have which requires Automatic issue a GIDEP without taking into account Automatic's CARs.

16.     Automatic has constantly reiterated that it has not received a response to the CARs, and that it would like to discuss the reports as soon as possible with DLA.

17.     GIDEP is a cooperative activity between government and industry participants seeking to reduce or eliminate expenditures of resources by making maximum use of existing information. The program provides a media to exchange technical information essential during research, design, development, production and operational phases of the life cycle of systems, facilities and equipment. GIDEP also uses reports to provide a means to exchange information about non-conforming items in government and industry systems. These reports (Alerts, Safe Alerts, Problem Advisories, Agency Action Notices and Lessons Learned) inform the GIDEP participants that a problematic situation exists and prevent usage of problematic products.

18.     On September 12, 2019, DLA issue a letter removing Automatic from the QPL, claiming that the Audit Report revealed a repeated and continuing course of conduct resulting in program violations and Automatic's alleged refusal to issue a GIDEP report informing the world about Automatic's alleged program violations. (Exhibit 3).

19.     Automatic is now being precluded from supplying connectors to its contractors and/or the Government, because Automatic will not be able to requalify since it does not know how the CARs were deficient.

20.     The Government now demands that Automatic, a small business, requalify all of its parts again, which would entail requalifying 610 parts and costing Automatic approximately $15,000 per part to requalify, and costing Automatic approximately $9,150,000.00 to requalify all of the parts.  Furthermore, the requalification process would be a sham, because Ms. Taylor is sitting on the CARs and has not provided Automatic any feedback or response explaining how the CARs are allegedly deficient.

21.     On October 9, 2019, DLA sent Automatic a letter, stating that it intends to issue a GIDEP alert on or shortly after October 31, 2019, alleging non-compliances and violations to MIL-PRF-39012 and MIL-PRF-55339, stating that it will be forwarded to the GIDEP office for distribution to thousands of government and industry GIDEP participants.  (Exhibit 4).

22.     Automatic has contacted DLA's counsel requesting that DLA provide feedback on how the CARs are allegedly deficient and to hold off on issuing a GIDEP Alert until a decision is made by the Court.  DLA has refused, and advised Automatic that DLA does not have to provide feedback, since Automatic has been removed from the QPL.

23.     Because the Government is in a nearly constant need for the parts, DLA is and has been requesting quotes for the connectors on a nearly continuous basis.

24.     By refusing to provide feedback on what allegedly remains deficient after Automatic submitted the CARs, DLA is violating the requirements of FAR 9.205 in that DLA is not giving Automatic a reasonable opportunity to arrange for qualification before award.

25. The following solicitations were open as of October 28, 2019:

| Solicitation No. | Closing Date |
| --- | --- |
| SPE7M5-20-T-1366 | October 28, 2019 |
| SPE7M1-20-T-2500 | November 4, 2019 |
| SPE7M1-20-T-2329 | November 4, 2019 |
| SPE7M0-20-T-1431 | November 12, 2019 |
| SPE7M1-20-T-3105 | November 14, 2019 |

26. Automatic is a potential bidder for the numerous solicitations for the connectors; however, due to the DLA's actions in improperly removing Automatic from the QPL, it is barred from submitting bids.

## CLAIM I

### (Injunctive Relief, 5 U.S.C. § 706)

27. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 26, above.

28. Plaintiff seeks a preliminary injunction and permanent injunctive relief preventing DLA from removing Automatic's parts from the QPL and from DLA issuing solicitations for the part numbers referenced above.

29. Plaintiff Automatic has no adequate remedy at law to prevent the destruction of its business from the Defendant DLA's arbitrary and capricious actions.

30. Under 5 U.S.C. section 706, the Court has the authority to "compel agency action unlawfully withheld or unreasonably delayed." Section 706 grants also grants the Court the authority to "hold unlawful and set aside agency action, findings, and conclusions" which are 1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 2) "in excess of statutory jurisdiction, authority, or limitations," or 3) "without observance of procedure required by law."

31.     Before DLA could remove Automatic's parts from the QPL, DoDM 4120.24,

Enclosure 14, Section 11(e) states in part that:

...
(2)     The qualifying activity conducts a preliminary evaluation and risk
assessment of the problem, and imposes a stop shipment on all suspect products,
if necessary, to limit the magnitude of the problem while determination and
corrective actions are made.
...
(4)     The qualifying activity initiates a product stop shipment order or
corrective action plan (as applicable) and initiates removal of parts or
manufactures from the electronic QPL or the QML in accordance with section 12
of this enclosure.
(5)     The qualifying activity instructs manufacturers to prepare and coordinate
issuance of a GIDEP alert or problem advisory. The qualifying activity should
prepare and issue the GIDEP alert or problem advisory when the manufacturer is
reluctant or slow in doing so. The qualifying activity should use GIDEP Failure
Experience Data Reports available at
http://www.gidep.org/data/failure/failure.htm to notify part users of the problem.

32.     DoDM 4120.24, Enclosure 14, Section 12 states in part that:

a.     <u>Reasons for Removal</u>. When a supplier fails to comply or demonstrates an
inability to comply with specification requirements, the qualifying activity must
remove the product(s) from the electronic QPL or remove the applicable
process(es) from the electronic QML. Removal could include a broad range of
directly or indirectly affected products, possibly the manufacturer's entire family
of qualified products. The qualifying activity must also remove the
manufacturer's certification, and may direct the manufacturer to stop shipment,
when such action is necessary to ensure that the manufacturer provides compliant
products. The qualifying activity should not remove a product, a manufacturer, or
a process from an electronic QML or QPL solely on the basis that the qualifying
activity did not perform a facility (plant) audit within the planned audit cycle.
Adverse actions or removal might be warranted under these circumstances:
...
(6)     Failure of a manufacturer to notify the qualifying activity of a change in
design, material, manufacturing, process (including quality conformance), or plant
location.
...
(8)     The manufacturer has not complied with the retention of qualification
requirements.

...
(11)     Failure to comply with an audit or denial of access of authorized personnel
to perform such an audit.

b.    Procedures for Removal. These procedures apply to removal of a product, a family of products, process, or supplier from an electronic QPL or QML:

(1)    If the decision to remove a product or process from an electronic QPL or QML is made for the reasons indicated in paragraphs 12.a.(1), 12.a.(4), 12.a.(6), 12.a.(8) or 12.a.(9) of this enclosure, consideration must be given to the circumstances that gave rise to that action. The product or process should again be included on the electronic QPL or QML once the deficiencies noted have been corrected to the government's satisfaction. Factors to be considered in making that determination are the seriousness of the deficiencies noted, the circumstances under which those deficiencies came to light (for example, government audit or voluntary disclosure), and whether circumstances indicate that such actions were intentional or fraudulently motivated or reflect a repeated or continuing course of conduct.

(2)    When it is decided that a product, family of products, or process is to be removed from an electronic QPL or QML, the supplier of the products or process must be sent a written notice (registered, with a return receipt requested) of the action taken, the reasons for removal, and an opportunity to respond to that notice. Unless the notice indicates otherwise, removal of a product, family of products, or process from the electronic QPL or QML is effective on the date of the notice.

c.    Notification of Removal. After the qualifying activity determines that a product, family of products, a process, or a supplier will be removed from an electronic QPL or QML, the qualifying activity must send the supplier a notification of removal. The qualifying activity must update the electronic QPL or QML to delete the items without undue delay. If removal is for the reason indicated in paragraph 12.a.(5) of this enclosure, the qualifying activity must advise the supplier of the action required to prove product compliance to the amended or revised specification. The qualifying activity must provide copies of the notification of removal to interested DoD elements and other government agencies.

d.    Publication of Removal. When the qualifying activity has taken action to remove a product from an electronic QPL or QML, the qualifying activity must determine whether it would be in the government's interest to publish in GIDEP, FedBizOpps, and related trade publications, a notification to government organizations and contractors that the product has been removed by adverse action…

33.    As stated above, DLA put Automatic on a stop shipment/stop production status because of the alleged violations that are listed in the Audit Report.  In accordance with DLA's directions included in the Audit Report, Automatic timely created CARs and is implementing the

corrective actions pursuant to the CARs that Automatic provided to DLA. However, again, Automatic has not received any response to the CARs.

34. Pursuant to DoDM 4120.24, Enclosure 14, Section 11(e)(2), the stop shipment should have only lasted while corrective actions were made. However, DLA apparently determined that the Automatic CARs were deficient, and subsequently removed Automatic from the QPL, without giving Automatic a chance to correct any alleged deficiencies that may exist with the CARs.

35. Since DLA chose to remove Automatic from the QPL, DLA is then supposed to follow the procedures of DoDM 4120.24, Enclosure 14, Section 12(b)(1), which states in part that "The product or process should again be included on the electronic QPL or QML once the deficiencies noted have been corrected to the government's satisfaction." However, Automatic could not correct the alleged deficiencies listed in the Audit Report to the Government's satisfaction, because, as stated repeatedly herein, DLA never provided any feedback to Automatic's CARs.

36. Had DLA provided feedback, Automatic could have corrected the alleged violations listed in the Audit Report and would have been put back on the QPL and would not be in a situation where Automatic is being forced to spend millions of dollars in order to requalify its parts.

37. DLA now wants to issue a GIDEP Alert, and DLA makes it seem that it does not have a choice in the matter, when DLA actually does have a choice. DoDM 4120.24, Enclosure 14, Section 12(d) states in part that "... qualifying activity has taken action to remove a product from an electronic QPL or QML, the qualifying activity must determine whether it would be in the government's interest to publish in GIDEP..." Automatic's parts that DLA removed from

the QPL were removed for alleged violations that dealt with the traceability of the parts (i.e. a paperwork issue), and not with the parts failing to perform as required.

38.     By DLA issuing the GIDEP Alert, it could cause significant harm to Automatic's business.

39.     Defendant DLA should be enjoined from excluding Automatic's parts from the QPL unless the Defendant fully and fairly complies with the requirements of DoDM 4120.24, Enclosure 14, Sections 11 and 12.

## CLAIM II

### (Declaratory Relief, 28 U.S.C. § 2201)

40.     Plaintiff realleges and incorporates herein by reference paragraphs 1 through 39, above.

41.     DLA has prevented Automatic from being included back on the QPL, has prevented Automatic from qualifying for additional DLA contracts, and has discouraged full and open competition for DLA contracts.

42.     Where possible, procuring agencies must give bidders sufficient time to qualify products prior to award of a contract subject to qualification requirements (FAR § 9.205(a)).

43.     Also, when initiating a qualification requirement, the agency must furnish notice of the intent to establish a qualification requirement, including, among other things, the "anticipated date that the agency will begin awarding contracts subject to the qualification requirement." (FAR § 9.205(a)).

44.     Furthermore, FAR § 9.205(b) states that "The activity responsible for establishing a qualification requirement must keep any list maintained of those already qualified open for inclusion of additional products, manufacturers, or other potential sources."

45.     In addition, FAR § 9.206-3(a), encourages competition states in part that

If a qualification requirement applies to an acquisition, the contracting officer shall review the applicable QPL, QML, ... which have met the requirement before issuing a solicitation to ascertain whether the number of sources is adequate for competition. ... If the number of sources is inadequate, the contracting officer shall request the agency activity which established the requirement to –
(1)     Indicate the anticipated date on which any sources presently undergoing evaluation will have demonstrated their abilities to meet the qualification requirement so that the solicitation could be rescheduled to allow as many additional sources as possible to qualify; or
(2)     Indicate whether a means other than the qualification requirement is feasible for testing or demonstrating quality assurance.

46.     DLA issues Solicitations for manufacturers to bid and provide parts to the Government. The Solicitation requires that the parts be on the QPL.

47.     As stated above, DLA completed an Audit of Automatic's facility, and allegedly found deficiencies at Automatic's facility. Pursuant to the Audit Report, Automatic could provide CARs to correct the deficiencies and DLA would provide a certified response.

48.     DLA has not provided any formal response, and have subsequently removed Automatic from the QPL.

49.     Furthermore, as a result of DLA not providing a response to the CARs, which would identify any alleged deficiencies in the CARs, DLA has prevented Automatic from being included back on the QPL.

50.     DLA has also prevented Automatic from being able to requalify for the QPL, because Automatic does not know what CARs are allegedly deficient, and as such, will not be able to requalify for the QPL and will not be able to bid on DLA Solicitations.

51.     As such, DLA has discouraged and denied Automatic from competing for DLA contracts.

## PRAYER FOR RELIEF

Therefore, Plaintiff prays that this Court:

1.    Preliminary and permanently enjoin DLA from issuing the GIDEP Alert.

2.    Preliminary and permanently enjoin DLA from issuing any more contracts for parts that Automatic had listed on the QPL.

3.    Declare that DLA cannot, consistent with the statutory requirement for full and open competition, established a qualification requirement, exclude Automatic from the QPL by failing to provide a formal response to the CARs, stating how they are allegedly deficient.

4.    For such other relief as the Court may deep appropriate.

Dated: November 21, 2019
      Auburn, New York

*/s/ Justin T. Huffman*
Justin T. Huffman, Esq.
Camardo Law Firm, P.C.
*Attorneys for Plaintiff*
127 Genesee Street
Auburn, New York 13021
Tel: (315) 252-3846
Fax: (315) 252-3508
Email: justinhuffman@camardo.com

# EXHIBIT 1

Date: 5/1/2019

**Specification Details:**

Specification: MIL-PRF-39012
Title: Connectors, Coaxial, Radio Frequency
Federal Supply Class (FSC): 5935
Conventional: Yes
Specification contains quality assurance program: No
MIL-STD-790 Established Reliability & High Reliability: No
MIL-STD-690 Failure Rate Sampling Plans & Procedures: No
Weibull Graded: No
Specification contains space level reliability requirements: No
Specification allows test optimization: No

**Contact Information:**

Office of Primary Involvement: Passive Devices Branch, DLA Land and Maritime - VQP
Primary Qualifying Activity Contact: 614-692-2193, e-mail: vqp.st@dla.mil
Secondary Qualifying Activity Contact: 614-692-3757, e-mail: vqp.dl@dla.mil

**Notes:**

N/A

**Part Configuration:**

M39012/01-XXXX

| General Specification | Slash Sheet | Dash Number |
|---|---|---|
| M39012 | /01 | -XXXX |

| PART LISTINGS | | | |
|---|---|---|---|
| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION OR TYPE NUMBER | TEST OR QUALIFICATION REFERENCE | SUPPLIER'S NAME (ADDRESS ON LAST PAGE) |
| M39012/01B0008 | 082-322 | 39012-4932-17 | Amphenol RF |
| M39012/01-0005 | 82-4352 | 39012-4932-17 | Amphenol RF |
| M39012/01B0007 | 82-340 | 39012-4932-17 | Amphenol RF |
| M39012/01-0501 | 82-4425 | 39012-4932-17 | Amphenol RF |
| M39012/01-0503 | 82-4427 | 39012-4932-17 | Amphenol RF |
| M39012/01-0005 | 20-01001-000, 20-01004-006 | 39012-1532-69; 39012-84-80 | Automatic Connector, Inc. |
| M39012/01-0005 | 20-01001-000 | 39012-1532-69; 39012-84-80 | Automatic Connector, Inc. |
| M39012/01-0015 | 20-01001-004 | 39012-1532-69 | Automatic Connector, Inc. |
| M39012/01-0016 | 20-01006-002 | 61174-2 | Automatic Connector, Inc. |
| M39012/01-0017 | 20-01006-003 | 61174-2 | Automatic Connector, Inc. |
| M39012/01-0018 | 20-01006-004 | 61174-2 | Automatic Connector, Inc. |
| M39012/01-0021 | 20-01006-001 | 61174-2 | Automatic Connector, Inc. |
| M39012/01-0022 | 20-01006-000 | 61174-2 | Automatic Connector, Inc. |
| M39012/01-0023 | 20-01006-006 | 61174-2 | Automatic Connector, Inc. |
| M39012/01-0024 | 20-01006-007 | 61174-2 | Automatic Connector, Inc. |
| M39012/01-0027 | 20-01006-008 | 61174-2 | Automatic Connector, Inc. |
| M39012/01-0101 | 20-01001-006 | 39012-99-78 | Automatic Connector, Inc. |
| M39012/01-0104 | 20-01001-009 | 39012-99-78 | Automatic Connector, Inc. |
| M39012/01-0125 | 20-01001-005 | 39012-99-78 | Automatic Connector, Inc. |
| M39012/01-0501 | 20-01006-009 | 61174-2 | Automatic Connector, Inc. |
| M39012/01-0502 | 20-01006-010 | 39012-654-83 | Automatic Connector, Inc. |
| M39012/01-0503 | 20-01012-000 | 39012-654-83 | Automatic Connector, Inc. |
| M39012/01-0504 | 20-01012-001 | 39012-654-83 | Automatic Connector, Inc. |

# EXHIBIT 2



# AUTOMATIC CONNECTOR

375 Oser Avenue
Hauppauge, New York 11788
(631) 543-5000 Phone
(631) 543-5107 Fax
autconn@aol.com

6 August 2019

Subj: DLA Land and Maritime Audit Report dated 8 July 2019

Dear Ms. Taylor,

As a result of the audit on June 26/27 2019 Automatic Connector has retained The Cypress Group to train management and staff for full compliance with MIL-STD-790, MIL-PRF-39012, and MIL-PRF-55339. They are assisting us with the Corrective Action recommendations ("CAR"), updated Procedures, new Procedures, and staff training needed to comply with the necessary standards. They will also be involved in the verification process. Automatic Connector is taking the following actions per the findings listed in the subject letter:

1. We have issued CAR 19-003 addressing Design and Construction changes and are revising our Purchasing Procedure to include the exclusion of new vendors without DLA notification. The appropriate staff have been trained to this procedure change. A list of all part numbers affected is included with this letter. No new vendors will be considered without contacting DLA first.

2. We have issued CAR 19-004 regarding traceability. The Stockroom Procedure is being revised to have all parts kept in bags, each bag to have a unique Parts Identifier Form with the information: part number, stock docket number, plating lot number, and quantity. The machine shop has segregated all bar stock without heat lot identification, and will be trained in new procedures being created under CAR 19-009.

3. We have issued CAR 19-005 regarding testing. The Inspection Procedure will be changed to include proper measurement of Mating Characteristics. The proper gauges will be manufactured by 15 August, 2019.

4. The first two numbers were the first two production lots made after being partially released from stop-ship in 2018 and they were missed when creating the retention report. The second two numbers were sold from finished goods and not manufactured. There are Group A & B test

reports for all four parts. We have issued CAR 19-006 regarding Retention Reporting. A Procedure is being created for preparing the Groups A and B Retention Report and the DD1718 not manufactured list.

5. We issued CAR 19-002 in early June to address the training issue regarding the filling of forms. We are halfway through the training. We revised our Auditing Procedure to include proper form filling. As part of CAR 19-009 we are adding Procedures for all assembly operations to the QMS. This will be completed by 09/22/19. The recording chart has been labelled OUT OF SERVICE.

6. We have issued CAR 19-007 regarding Calibration. The Machine Shop staff will be included in Calibration training as part of the Machine Shop Processes being added to the QMS.

7. We have issued CAR 19-008 regarding Non-Conforming Material disposition. A secure area has been created to store the material prior to disposition.

8. As stated earlier, we are planning for management to have MIL-STD-790 training by a local auditing firm, The Cypress Group. Training is expected to be completed by 30 September 2019. All of the Procedures being revised as part of the Corrective Actions will identify the proper elements of MIL-STD-790.

9. We cannot find the CAR's from 2016. All DLA communication with Automatic Connector was done through an independent Quality contractor's email and is no longer there. We need to get a copy from you to keep in our CAR binder.

10. Please see item 2.

11. We have issued CAR 19-009 regarding the Machine Shop and Document Control. All documents used in the Machine Shop will be controlled as part of our Corrective Action of including machining operations in the Quality Management System.

12. Please see item 11.

13. Please see item 11. We are writing a controlled document for training for each procedure involved with production, and training the proper personnel.

Now that we have submitted our proposed Corrective Actions we will begin supplying objective evidence of our implementation to you.  We are implementing many of the proposed Corrective Actions already especially those regarding traceability and document control so we look forward to working with you and following them with QPL production.

Sincerely,

Michael Donahower

Quality Manager

# AUTOMATIC CONNECTOR
# CORRECTIVE ACTION RECOMMENDATION

| Origination Date: 07/09/19 | CAR # 19-003 |
|---|---|
| Name of Originator: Robert Carrillo | CAR Type: External Audit |
| Issued To: Michael Donahower | Due Date: 08/07/19 |
| CAR Types: Supplier, Internal or External Audit, Mgt. Review, Calibration, Process, Nonconforming Product, Customer Complaint | |

## Problem Description:

Automatic Connector did not notify the DLA of proposed change in subcontractors. New machined parts were made by an existing subcontract facility, approved by DLA and a new plating facility was approved by Automatic Connector due to quality issues with the previous plating supplier.

The machining source and plating subcontractors were changed without proper and prior notification to the qualifying activity. in accordance with MIL-STD-790 para. 5.1.4.

## Immediate Action/Containment:

Containment:

*Completed on 07/03/19:* Review all product in WIP and in stock that may have same or similar issue. We identified the parts that require notification to the qualifying activity. Due to the stop-production order the parts are not being used to manufacture qualified products. The specific parts have been determined to meet all specification requirements (form, fit, and function) and articles using these parts are currently being tested as part of our Group C retention testing.

Immediate Action:

*Completed on 07/03/19:* The parts were identified and placed on hold and segregated pending a DLA decision regarding disposition.

## Root Cause:

The QPL specifications were not fully understood by the Quality staff. Automatic Connector was not fully aware that MIL-STD-790 was now a requirement of MIL-PRF-39012.

# AUTOMATIC CONNECTOR
# CORRECTIVE ACTION RECOMMENDATION

## Corrective Action:

*Completed by 06/27/19*: Immediate training for Purchasing staff. No new vendors are to be used for QPL parts without notifying Quality for review and, as required proper notification to DLA prior to use.
*Completed by 08/05/19*: Automatic Connector is on the email list for specification updates and drafts from DLA Lead Electrical Engineer Jeremy Funk.
*Completed by 08/22/19*: Change Procedure S3-PO-001 to include a decision regarding vendor choice and QPL products.

## Evaluation of Effectiveness:

*Completed by 09/22/19*: Follow-up verification one month after implementation. Purchase orders for parts used in QPL manufacturing will be audited to assure no new suppliers and processes have not been added without Quality approval.

**Completed By:**   Michael Donahower                **Date:**   08/06/19

**Implementation Date:**   08/22/19

**Follow-Up Date:**   09/22/19

**Quality:** _____   **Close Date:** _____

# AUTOMATIC CONNECTOR
## CORRECTIVE ACTION RECOMMENDATION

| Origination Date: 07/09/19 | CAR # 19-004 |
|---|---|
| Name of Originator: Robert Carrillo | CAR Type: External Audit |
| Issued To: Michael Donahower | Due Date: 08/07/19 |
| CAR Types: Supplier, Internal or External Audit, Mgt. Review, Calibration, Process, Nonconforming Product, Customer Complaint | |

## Problem Description:

There is no material traceability from a final product back to the parts back to the specific materials for heat lots, production lots, plating lots, etc. This is systemic through the Machine Shop and the stockroom. There is not an effective system to satisfy MIL-STD-790 para. 5.2.12.4 and 5.2.13.

## Immediate Action/Containment:

### Containment:

*Completed on 09/06/19:* Review all product in WIP and in stock that may have same or similar issues. Product placed on hold and segregated during stop-production. Inventory that has inadequate traceability is being identified and bagged with the Piece Part ID form as "untraceable" designated for non QPL production, (note this is an ongoing activity). Traceability issue impacts all QPL product. DLA is determining the impact and appropriate actions. QPL product containing parts with inadequate traceability have passed Group A, B and C testing.

### Immediate Action:

*Completed on 06/28/19:* Organized the bar stock so that all identified stock is kept in a separate "QPL ONLY" area away from unidentified stock. Identified stock is zip-tied together with a heat lot ticket.

*Completed on 07/10/19:* Create a new Piece Part Identifier Form that contains Part #, Docket #, Quantity, and Plating Lot # if applicable. Change the stockroom procedure to require all parts to be kept in sealable bags each with a Piece Part Identifier inside.

# AUTOMATIC CONNECTOR
# CORRECTIVE ACTION RECOMMENDATION

**Root Cause:**

The Machine Shop is not part of the QMS since the beginning of ISO 9001 certification. There are no provisions for complete traceability in the existing Stockroom Procedure (P2-STK-001). The Inspector was not fully following the Inspection Procedure (S4-RI-001). The piece part lots are treated as bulk and not treated like individual lots. No provisions were put into place when MIL-STD-790 requirements became part of MIL-PRF-39012. QA had not realized that MIL-STD-790 was imposed as part of 39012.

**Corrective Action:**

a) *Completed on 07/10/1:* training for Machine Shop, Stockroom, and Production staff regarding traceability of all raw materials and parts. The Machine Shop is being brought into the QMS, please reference CAR 19-009.

b) *Completed by 08/15/19:* Change Stockroom Procedure P2-STK-001 to mandate:

   1) that all parts placed in stock or a kit be kept in sealed bags with a unique Piece Parts Identification form indicating Inspection Stock Docket and necessary Plating Lot numbers.

   2) All extra parts at the end of production to be returned with their Identification form and returned to stock. Stock Docket to reflect the return.

   3) All kits checked for traceable material certificates before being issued by the Production, Inspection or Quality Manager.

   4) Any requests for additional parts during production to be documented on a new Order Status sheet, the operation of which will be added to the Kitting Procedure.

   5) All Machine Shop, Stockroom, and Production staff to be trained for the Procedure changes.

c) Review training for Stock Docket preparation for the inspection staff.

**Evaluation of Effectiveness:**

*Completed by 09/13/19:* Follow-up verification one month after implementation. Traceability will be from the finished product traveler to the incoming inspection and material certificates of all component parts and in accordance with MIL-STD-790, para. 5.2.12.

# AUTOMATIC CONNECTOR
# CORRECTIVE ACTION RECOMMENDATION

**Completed By:** __Michael Donahower__      **Date:** __08/05/19__

**Implementation Date:** __08/15/19__

**Follow-Up Date:** __09/13/19__

**Quality:** _____      **Close Date:** _____

# AUTOMATIC CONNECTOR
# CORRECTIVE ACTION RECOMMENDATION

| | |
|---|---|
| Origination Date:  07/09/19 | CAR # 19-005 |
| Name of Originator: Robert Carrillo | CAR Type: External Audit |
| Issued To: Michael Donahower | Due Date: 08/07/19 |
| CAR Types:  Supplier, Internal or External Audit, Mgt. Review, Calibration, Process, Nonconforming Product, Customer Complaint | |

## Problem Description:

There are no specific test rings for Inspection to use when doing Group B Mating Characteristics.  Inspection is using a mating connector which is not in accordance with MIL-PRF-39012 para. 3.7 and 4.6.4.

## Immediate Action/Containment:

### Containment:

*Completed on 06/27/19*: Put a hold on any Group A and B testing that requires the test ring test.

### Immediate Action:

*Completed on 07/03/19:* Identify that all connectors requiring a test ring for testing Mating Characteristics (plug connectors with spring outer contacts) were tested with the proper method as part of the Group C retention tests every three years. Reviewed the MIL-PRF-39012 slash sheets to identify connectors needing the ring test and the ring sizes required.

## Root Cause:

Quality staff thought that the ring test for Mating Characteristics was a Group C test. As a result, the proper method was not being performed for Group B tests.

## Corrective Action:

*Completed by 08/15/19:* Have the proper test rings manufactured and added to the Calibration System.
*Completed by 08/22/19*: Create an Inspection Procedure for QPL parts indicating Groups A & B tests to be performed.  Train Inspection and Lab staff to the revised procedure.

# AUTOMATIC CONNECTOR
# CORRECTIVE ACTION RECOMMENDATION

**Evaluation of Effectiveness:**
*Completed by 09/23/19*: Follow-up verification one month after implementation. Verify that the test rings have been assigned identification numbers, are being used properly and have been added to the Calibration Schedule.


**Completed By:** __Michael Donahower__          **Date:** __08/05/19__

**Implementation Date:** __08/22/19__

**Follow-Up Date:** __09/23/19__

**Quality:** _____          **Close Date:** _____

# AUTOMATIC CONNECTOR
## CORRECTIVE ACTION RECOMMENDATION

| | |
|---|---|
| Origination Date: 07/09/19 | CAR # 19-006 |
| Name of Originator: Robert Carrillo | CAR Type: External Audit |
| Issued To: Michael Donahower | Due Date: 08/07/19 |
| CAR Types: Supplier, Internal or External Audit, Mgt. Review, Calibration, Process, Nonconforming Product, Customer Complaint | |

## Problem Description:

The first two part numbers manufactured (M39012/16-0502 twice) in small quantities after a partial stop-shipment release were not documented on the Groups A & B Retention Report for 2018. Part numbers (M39012/16-0503 and M39012/16-0504) in the finding were actually from finished goods and not manufactured. There are Group A & B reports for all four items.

## Immediate Action/Containment:

Containment:
*Completed on 07/11/19:* Reviewed the partially completed 2019 Groups A & B Report to find and fix for any inconsistencies. Two omissions were found.

Immediate Action:
*Completed on 08/22/19:* Amend the 2018 Groups A & B report and submit to DLA.

## Root Cause:

The two orders were missed by Quality staff when preparing the form. These same part numbers were made subsequently in much larger amounts, Groups A & B inspected, and all documented in the 2018 retention report.

## Corrective Action:

*Completed by 08/26/19:* Create a Procedure for preparing the Retention Reporting with a second person auditing the reports before they are filed with the DLA. The annual Group A & B Retention Report will be checked and updated as a part of the monthly QPL Lab audit.
*Completed by 09/03/19:* Train authorized Lab staff on the newly created process.

B2-CAR-1.2 REV. C

# AUTOMATIC CONNECTOR
# CORRECTIVE ACTION RECOMMENDATION

**Evaluation of Effectiveness:**
*Completed by 09/27/19* Follow-up verification one month after implementation.
Perform an audit of the Lab Log, the QPL Lab Audits, and the partial 2019 Groups A &
B Retention Report. Assure that all part numbers and quantities are accounted for.


**Completed By:** __Michael Donahower__          **Date:** __08/05/19__

**Implementation Date:** __08/26/19__

**Follow-Up Date:** __09/27/19__

**Quality:** _____          **Close Date:** _____

# AUTOMATIC CONNECTOR
## CORRECTIVE ACTION RECOMMENDATION

| | |
|---|---|
| Origination Date:   07/09/19 | CAR # 19-007 |
| Name of Originator: Robert Carrillo | CAR Type: External Audit |
| Issued To: Michael Donahower | Due Date:  08/07/19 |
| CAR Types:  Supplier, Internal or External Audit, Mgt. Review, Calibration, Process, Nonconforming Product, Customer Complaint | |

## Problem Description:

- Pin gauges in inspection not labelled as calibrate before use
- Thread gauges in the machine room not labelled as calibrated
- Calibration dates not matching between stickers and schedule
- Calibration form not a controlled document
- Calibration Procedure has no provision for controlling badly calibrated or broken equipment and there are no decisions to check for non-conforming product in the flow.

## Immediate Action/Containment:

### Containment:
*Completed by 09/22/19:*  Identify all gauges used for the machining of QPL parts, have them calibrated, and keep all other gauges separated in a locker.

### Immediate Action:
*Completed by 08/15/19:*  The calibration form will be added to the QMS documentation.

## Root Cause:

Internal audits not being properly performed and the Audit and Calibration Processes was ineffective.

# AUTOMATIC CONNECTOR
# CORRECTIVE ACTION RECOMMENDATION

## Corrective Action:

*Completed by 09/23/19:* Perform a full audit to identify all equipment that is not properly identified and/or calibrated. Assure calibration dates on equipment and tools match the documented calibration dates (calibration certificate, etc.).

*Completed by 09/23/19:* Create a process for the control of nonconforming monitoring and measurement equipment. This will include the identification, investigation of potential impact on product, recording of results of investigation and actions taken, and disposition. Create a Control of Nonconforming Monitoring & Measuring Equipment form to record the investigation and actions taken for equipment found to be non-conforming.

*Completed by 09/22/19:* Perform training for all employees involved in the calibration or use of monitoring and measurement equipment. Training will include, as appropriate:

- Verify up to date calibration label before use.
- The process for control of nonconforming monitoring and measurement equipment
- Need to notify appropriate functions of any equipment that is past due, uncalibrated, or suspect nonconforming.
- Understanding of:
    - What equipment requires calibration.
    - What is required for calibrate before use.
    - What equipment can be for reference only and what limitation of use there are.

*Completed by 09/30/19:* Improve the Calibration Procedure for all measuring equipment needing calibration: identification, function, necessity, labelling, tracking, verifying, and auditing. The calibration process will be incorporated into the process audits throughout the year. In addition, two calibration system audits will be performed per calendar year.


## Evaluation of Effectiveness:

*Completed by 10/22/19:* Follow-up verification one month after implementation. Randomly select tools and equipment throughout the company and assure they have proper identification and their calibration dates match the calibration records. At minimum, the sampling should include 40 items.

# AUTOMATIC CONNECTOR
# CORRECTIVE ACTION RECOMMENDATION

**Completed By:** __Michael Donahower__          **Date:** __08/05/19__

**Implementation Date:** __09/22/19__

**Follow-Up Date:** __10/22/19__

**Quality:** _____          **Close Date:** _____

# AUTOMATIC CONNECTOR
# CORRECTIVE ACTION RECOMMENDATION

| | |
|---|---|
| Origination Date:   07/09/19 | CAR # 19-008 |
| Name of Originator: Robert Carrillo | CAR Type: External Audit |
| Issued To: Michael Donahower | Due Date: 08/07/19 |
| CAR Types:  Supplier, Internal or External Audit, Mgt. Review, Calibration, Process, Nonconforming Product, Customer Complaint | |

## Problem Description:

There is no control of internal in-process Non-Conforming Material (NCM). External Nonconforming Material (Customer Returns) is compliant.  In-process NCM was scrapped without proper containment and documentation.  The current practice is not compliant with MIL-STD-790 para. 5.2.12.3

## Immediate Action/Containment:

### Containment:

*Completed by 06/28/19:*  All nonconforming material in all areas will be identified and retained with individual tags, within bags and placed in a secured cabinet while the necessary ID tag is being designed and a proper containment area is prepared.  No product is affected because all previous in-process nonconforming material has been disposed of already.

### Immediate Action:

*Completed on 06/28/19:*  Identify any product currently in WIP that is Nonconforming. All identified material will be properly identified, segregated, and recorded as noted above in "Containment".  Found 7 items in the Quality desk drawer that were not discarded and segregated them as NCM.  Tags will be added to the bags when they are received.

## Root Cause:

The Nonconforming Material Procedure S5-NCM-001 was not being followed for in-process Nonconforming Material by Manufacturing and Quality personnel. Manufacturing personnel did not quarantine and move inprocess NCM to Quality as required. Audits of this Procedure were not effective as it focused solely on the Inspection areas and not Manufacturing and Production.

# AUTOMATIC CONNECTOR
## CORRECTIVE ACTION RECOMMENDATION

**Corrective Action:**
*Completed by 09/06/19:* Update the control of Nonconforming product Procedure S5-NCM-001 to better detail the process for the control of internal nonconformances. It will include the:
- Identification of NC (Nonconformance Tag)
- The segregation of product found to be nonconforming
- Proper recording of NC instances (NC report, NC Log, Traveler, etc.)
- Timely disposition of NC
- Need to positively control or permanently identify product disposition as scrap until rendered physically unusable.
- Control process for product dispositioned as rework. Including the need to reinspect.
- Determination of impact to customer and regulatory agencies as well notification of NCM escapes.

*Completed by 09/06/19:* Create a segregate locked area for storing internal NCM.
*Completed by 09/13/19:* As appropriate, train all Production, Inspection, Finished Goods, and Shipping/Receiving of product the process for control of nonconforming material/product.

**Evaluation of Effectiveness:**
*Completed by 10/14/19:* Follow-up verification one month after implementation. Audit of the manufacturing area, machine shop and inspection areas for nonconforming material and objective evidence that the new process is effectively implemented and being followed. Assure NCM is properly documented, identified and segregated in all areas.


**Completed By:**   Michael Donahower          **Date:**   08/05/19

**Implementation Date:**  09/06/19

**Follow-Up Date:**  10/14/19

**Quality:** _____     **Close Date:** _____

# AUTOMATIC CONNECTOR
# CORRECTIVE ACTION RECOMMENDATION

| Origination Date: 07/09/19 | CAR # 19-009 |
|---|---|
| Name of Originator: Robert Carrillo | CAR Type: External Audit |
| Issued To: Michael Donahower | Due Date: 08/07/19 |
| CAR Types: Supplier, Internal or External Audit, Mgt. Review, Calibration, Process, Nonconforming Product, Customer Complaint | |

## Problem Description:

The Machine Shop is not controlled as part of the Quality Management System. Documents elsewhere are not adequately approved or controlled. Individual production work instructions are not documented or controlled. They are described in Assembly Instructions but not described in specific controlled documents.

## Immediate Action/Containment:

### Containment:
*Completed on 07/17/19:* Immediately discontinue use of all uncontrolled documents.

### Immediate Action:
*Completed on 07/03/19:* Remove all uncontrolled documents from the machine shop floor. QA to review the documents for applicability.

## Root Cause:

The Machine Shop was treated as an Approved Vendor in the ISO 9001 compliant QMS since the time of ISO registration. This is not compliant with the requirements of MIL-STD-790 Appendix A. Assembly training included all different functions as one function.

## Corrective Action:

*Completed by 08/22/19:* The Document Control Procedure S1-DC-001 will be updated to include disposition and control of obsolete documents.

*Completed by 09/05/19:* Create controlled documents for all production procedures. Perform necessary training for authorized staff.

B2-CAR-1.2 REV. C

# AUTOMATIC CONNECTOR
# CORRECTIVE ACTION RECOMMENDATION

*Completed by 10/29/19:* A full review of the Machine Shop process will be performed to determine the process (inputs, activities, outputs). Results of review will allow the creation of documented information and implementation of QMS requirements for the machine shop. Activities will include:

- Identify all forms currently used in the machine shop area and determine their applicability. Incorporate required documents into the QMS Document Control process (S1-DC-001)
- Create procedures to define the current Machine Shop process. Procedures should include requirements for:
  - Plan and development of production process. Including creation of work instruction, setup instructions, and manufacturing plans.
  - Configuration Management requirements
  - Preventive maintenance
  - Control of Process changes
  - Identification and traceability
  - Product preservation- handling and storage
  - Customer property
  - Post-delivery requirements
  - Release of product
  - Actions to prevent human error

*Completed by 10/31/19:* All machine shop employees will be trained in the updated process.

**Evaluation of Effectiveness:**
*Completed by 12/03/19:* Follow-up verification after implementation and training. Audit Machine Shop, Brazing, Inspection areas, Manufacturing and Production, Stockroom and front office (Purchasing, Sales) and assure forms in use are properly controlled and defined in the QMS.

# AUTOMATIC CONNECTOR
# CORRECTIVE ACTION RECOMMENDATION

**Completed By:** __Michael Donahower__          **Date:** __08/05/19__

**Implementation Date:** __10/29/19__

**Follow-Up Date:** __12/03/19__

**Quality:** _____          **Close Date:** _____


Dear Sir/Madam,

Cypress Group is a Quality Management System (QMS) consulting firm that has been serving the Aerospace and commercial industry since 1987. We specialize in QMS specifications such AS9100, ISO9001, AS9120, and MIL-STD-790. We have recently established a working partnership with Automatic Connectors designed to help improve the current QMS and close the DLA audit findings. We have reviewed the findings from the DLA Audit Report dated July 8, 2019 and are assisting Automatic Connector staff with the preparation of the Corrective Actions in order to bring them into compliance with Customer, Internal, and Government/Industry QMS Specifications. Review included discussions on containment action, immediate action, root cause analysis, actions to prevent reoccurrence of nonconformance, and verification of implementation and effectiveness.

We have also discussed additional future activities such as;
- Updating and improving current QMS documented information
- ISO9001 and MIL-STD-790 overview training
- Verification of implementation and effectiveness of DLA audit finding CAR

The goal for Cypress Group and Automatic Connectors is the effective closure of the DLA Audit findings which will allow for the release of the current hold on production and delivery. I feel confident that we can satisfy all current concerns and work to improve the QMS. If you have any questions or comments please feel free to contact me.

Sincerely,
Sean Boyle
Vice President

# EXHIBIT 3



# DEFENSE LOGISTICS AGENCY
LAND AND MARITIME POST
OFFICE BOX 3990
COLUMBUS, OH 43218-3990

September 12, 2019

Mr. Dave Lax
President
Automatic Connector, Inc.
375 Oser Avenue
Hauppauge, NY 11788

Dear Mr. Lax:

SUBJECT:   Removal of Automatic Connector, Inc. CAGE CODE 94375, from QPL for MIL-
PRF-39012 and MIL-PRF-55339; FSC 5935; VQP-19-034287;
CN 068800

This letter is to inform you that DLA Land and Maritime-VQ (VQ), the qualifying activity, has removed Automatic Connector, Inc., CAGE 94375, from all subject QPLs.

Automatic Connector, Inc. failed to meet its obligations under the QPL Program. On July 2, 2019, VQ issued a Stop Shipment, Stop-Production notice to Automatic Connector, Inc. in reference to the specifications listed above. The stop-ship, stop-production notice was in response to the multiple QPL program violations found during a DLA-VQ audit of the Automatic Connector facility. The VQ audit report reveals that Automatic Connector has engaged in a repeated and continuing course of conduct resulting in a significant number of program violations requiring its removal from the electronic QPL. In addition to this, Automatic Connector, Inc. has refused to issue a GIDEP informing the end user of its program violations and non-compliance to the applicable specifications.

Automatic Connector's disregard for its obligations under the QPL program have directly and adversely affected product quality across all the referenced specifications. Simply stated, for several years, Automatic Connector has ignored and circumvented VQ's authority as the qualifying activity. Automatic Connector, Inc. repeatedly:

1. Changed product design without VQ's authorization and requalification testing
2. Changed suppliers without notifying VQ
3. Filed Form DD1718 stating no changes to product design occurred, yet changes were noted
4. Failed to perform required conformance testing on all QPL lots prior to shipping parts
5. Failed to perform conformance testing to specification requirements
6. Submitted retention reports for conformance testing to VQ with missing and/or false information on QPL parts produced and shipped
7. Failed to establish a functional Calibration system to track and verify tools used for product verification
8. Failed to perform and/or complete required requalification testing in a timely manner
9. Failed to establish and follow a process to track non-conformances throughout the manufacturing process and final testing
10. Failed to establish a quality systems consistent with the requirements of the QPL program

11. Failed to comply with specification and standards traceability requirements for QPL parts

Pursuant to Paragraph 12(a), Enclosure 14, of DODM 4120.24, the facts and circumstances facts described above warrant the removal of Automatic Connector, Inc. from the electronic QPL. Therefore, effective as of the date of this letter, Automatic Connector, Inc. (CAGE CODE 94375) is removed from all listings for MIL-PRF-39012, and MIL-PRF-55339. Finally, pursuant to paragraph 12(b)(2), Enclosure 14 of DODM 4120.24, Automatic Connector, Inc. is afforded an opportunity to respond and set forth any facts you deem relevant to this matter.

If you have any questions about this letter, please contact Sonya Taylor at Sonya.Taylor@dla.mil.

Sincerely,

HEBER.ROB
ERT.M.1230
099495

Digitally signed by
HEBER.ROBERT.M.12
30099495
Date: 2019.09.12
09:46:21 -04'00'

ROBERT M. HEBER
Chief
Sourcing and Qualifications Division

# EXHIBIT 4



October 9, 2019

Mr. Dave Lax
Automatic Connector, Inc.
375 Oser Avenue
Hauppauge, NY 11788

Dear Mr. Lax

Re: Proposed Government Industry Data Exchange Program (GIDEP) ALERT for MIL-PRF-39012 and MIL-PRF-55339 QPL parts; Preparing Activity: DLA-CC, FSC 5935, Letter Number: VQP-20-034365, Control Number: 069131

The attached draft of the GIDEP ALERT describes non-compliances to the QPL program and specification violations to MIL-PRF-39012 and MIL-PRF-55339 which resulted in Automatic Connector's removal from the QPL program. Fifteen (15) working days from the date of this letter, the enclosed GIDEP ALERT for MIL-PRF-39012 and MIL-PRF-55339 will be forwarded to the GIDEP office for distribution to thousands of government and industry GIDEP participants.

Government and industry organizations participate in GIDEP to exchange information on parts, components, software, specifications, test equipment, materials and safety problems. The Qualifying Activity is obligated to issue a GIDEP Alert or Problem Advisory whenever the manufacturer is reluctant to do so. The GIDEP Alerts are issued to highlight issues that are of immediate concern to members of the GIDEP community.

We solicit your comments regarding the draft GIDEP. We request that your response addresses each of the program violations and non-conformances.

Written, fact based comments received by October 31, 2019, will be considered for inclusion within the subject GIDEP Alert for distribution via GIDEP system. If you have any questions concerning this letter, please contact Robert Heber at Robert.Heber@dla.mil.

Sincerely,

HEBER.ROBER
T.M.12300994
95
Digitally signed by
HEBER.ROBERT.M.12300
99495
Date: 2019.10.09
13:33:19 -04'00'

ROBERT M. HEBER

Chief
Sourcing and Qualifications Division

# ALERT

| 1. TITLE *(Class, Function, Type, etc.)* | 2. DOCUMENT NUMBER |
|---|---|
| MIL-PRF-39012; Connectors Coaxial, Radio Frequency<br>MIL-PRF-55339; Adapters, Connectors, Coaxial, Radio Frequency | |
| | 3. DATE *(DD-MMM-YY)*<br>XX-October-19 |

| 4. MANUFACTURER AND ADDRESS | 5. PART NUMBER | 6. NATIONAL STOCK NUMBER |
|---|---|---|
| Automatic Connector, Inc.<br>375 Oser Avenue,<br>Hauppauge, NY 11788 | All M39012 parts<br>All M55339 parts | Not available |
| | 7. SPECIFICATION<br>MIL-PRF-39012<br>MIL-PRF-55339 | 8. GOVERNMENT PART NUMBER<br>M39012/various<br>M55339/various |
| | 9. LOT DATE CODE START<br>1814 | 10. LOT DATE CODE END<br>1927 |

| 11. MANUFACTURER'S POINT OF CONTACT<br>Michael Donahower | 12. CAGE<br>94375 | 13. MANUFACTURER'S FAX<br>( 631)543-5107 |
|---|---|---|
| 14. MFR. POC PHONE<br>( 631)543-5000 | 15. MANUFACTURER'S E-MAIL<br>autoconn@aol.com | |
| 16. SUPPLIER<br>Not Applicable | 17. SUPPLIER ADDRESS<br>Not applicable | 18. SUPPLIER CAGE<br>Not applicable |

**19. PROBLEM DESCRIPTION / DISCUSSION / EFFECT**

During a DLA Land and Maritime (DLA-VQ) audit of the Automatic Connector facility held on June 26-27, 2019, it was found that Automatic Connector had multiple QPL program violations as well as a systemic non-conformance to traceability requirements of MIL-STD-790. It was also found that Automatic Connector failed to perform required conformance testing (group A and B) on some MIL-PRF-39012 QPL parts, prior to shipping product out the door. For the Group A and B testing that was performed, the Mating Characteristics test was not performed per the specification requirements. (At the time of this audit, Automatic Connector was on a stop-ship for delinquent Group C testing to verify MIL-PRF-55339 product currently in the field.)

The program violations and non-conformance to applicable specification requirements include:
1. Changed product design and suppliers without DLA-VQ's authorization and requalification testing
2. Failed to perform required conformance testing on all QPL lots prior to shipping parts
3. Failed to perform conformance testing to the specification requirements
4. Submitted retention reports for conformance testing to DLA-VQ with missing and or false information on QPL parts produced and shipped
5. Failed to establish a functional Calibration system to track and verify tools used for product verification
6. Failed to perform and/or complete required requalification testing in a timely manner
7. Failed to establish and follow a process to track non-conformances throughout the manufacturing process and final testing
8. Failed to establish and follow a quality system consistent with the requirements of the QPL program
9. Failed to comply with specification and standards traceability requirements for QPL parts

The audit revealed that Automatic Connector has been cited for repeat program violations on past DLA-VQ audits. The corrective actions to close past audit findings were either non-effective or not implemented.

**20. ACTION TAKEN/PLANNED**

As a result of the audit findings, QPL program violations, and non-compliance to required MIL-PRF-39012 and MIL-PRF-55339 conformance testing, Automatic Connector has been removed from the QPL program as of September 12, 2019.

End users may contact Automatic Connector for guidance and make their own evaluation as to the sufficiency of the subject product for continued use. Contact Automatic Connector with any questions or for information regarding the product confidence testing related to the Group A and B conformance tests.

| 21. DATE MFR. NOTIFIED/ SUPPLIER NOTIFIED | 22. MFR./SUPPLIER RESPONSE | 23. ORIGINATOR ADDRESS/POINT OF CONTACT |
|---|---|---|
| | ☐ REPLY ATTACHED <br> ☐ NO REPLY | Robert Heber <br> DLA Land and Maritime- VQ <br> P.O. Box 3990 <br> Columbus, OH 43218-3990 |

| 24. GIDEP REPRESENTATIVE | 25. SIGNATURE | 26. DATE |
|---|---|---|
| | | |

GIDEP Form 97-1 (September 2009)